# THE LAKE ERIE & WESTERN RAILROAD COMPANY

## v.

## JOHN B. WILLS.

*Railroads—Negligence of—Crossing—Personal Injuries—Contributory Negligence—Duty to Look and Listen—Practice.*

1. The formal *ad damnum* appearing at the end of a given count applies to all the counts that precede it.

2. It is proper in personal injury cases to ask a physician, testifying as an expert, whether certain injuries are permanent or not, and whether the same are of a class that are necessarily painful.

3. It is as much the duty of a hand car crew upon approaching, with their car, a street crossing, the greater part of which is occupied by a stand-

ing train, to use such care as will prevent injury to themselves, as others approaching the same, having equal rights.

[Opinion filed June 12, 1891.]

APPEAL from the Circuit Court of McLean County; the Hon. OWEN T. REEVES, Judge, presiding.

Messrs. W. E. HACKEDORN and A. E. DEMANGE, for appellant.

Mr. THOMAS F. TIPTON, for appellee.

PLEASANTS, J. This was an action on the case for injury to the person and property of appellee by collision of appellant's hand car with his wagon, on its track, at the crossing of Grand street, in the village of Saybrook. Verdict and judgment for $4,500.

Grand street runs east and west, and is fifty feet in width. The railroad crosses it diagonally, northwest and southeast, with a main track and a switch or side track about seven feet apart, the easterly one being the switch. On July 18, 1889, appellee with his wagon and team was hauling sand over this crossing. On the occasion in question, he came from the east to appellant's right of way on the next parallel street south, and thence up, on the east side of the tracks, to Grand. A train of five freight cars, extending from the street northwest, stood on the switch, one car, and at least ten feet of another, being within the street and occupying a considerable part of the sixteen foot planking laid in the center for crossing the tracks. To avail himself of this planking he was obliged to drive close to the car. The ground at the street south was considerably below the tracks, rising to grade at Grand. At the further end of this line of the cars was the cattle chute and stock yards, and beyond them a cut.

By reason of these conditions appellee could not see up the main track until he passed or nearly passed the freight car, when his horses would be about on it, or just going upon it. As he reached Grand street and was turning west to make

the crossing he heard the whistle of a freight train approaching from the northwest. Thereupon he stopped, stood up, and looking over the cars on the switch saw the smoke and stack of the coming locomotive. The train was then so far away that he could go on without danger from it; but the more certainly to avoid it, "slapped up" his horses to hurry them, and when he was just over the switch and they about stepping on the main track, was first able to see the hand car, coming from the same direction and then within a few feet of his team. Having but an instant to choose between an attempt to back and going on, he "yelled to his horses and they sprang forward," but it struck his front wheel, breaking it and the single-trees and throwing him out on his arm and head.

The men on the hand car, at some distance up the road, had heard the noise of the freight train before it whistled, and determined to run down to a point a little below that at which the collision occurred and there take the car off to let the freight pass. There is some conflict in the testimony as to the rate of speed at which they were running. They say from four to five miles an hour, while other witnesses thought they were going as fast as they could. They further say they could have stopped in twenty-five feet; that they did not see the team until just as they struck it, and could not, because of the freight car in the street, until it was too late for them to avoid the collision. John Nelson, Jr. testified: "I believe we could have seen a man coming in time to have stopped the car before it struck the wagon, if the car hadn't been there;" and, "I don't think we could have stopped the car if we had seen Mr. Wills' team coming from behind the freight car." "I don't think we could have seen plaintiff's team ten or twelve feet before he got on the main track." Peter Pierson said: "We were not far enough back when we could have seen him, to have stopped the car."

To those who did not see it there was no notice of the coming of the hand car except the noise it made. Appellee did not hear that. A witness who was two and a half blocks west of the track, says he heard it. But he had some advan-

tage of appellee with reference to it. He saw it coming and
his attention was drawn directly to it by the sight. He was
on foot and not in a rumbling two-horse wagon. The wind
may have favored him. It does not appear that there was any-
thing between him and it, to obstruct or divert the sound.

The freight car on the street had been left there as it then
was, since the morning before. Appellee had hauled sand
over that crossing all of the previous day and knew its con-
dition and surroundings. On the occasion in question he was
cut off from sight and hearing of the hand car by intervening
objects. He was in charge of his team, giving it his attention.
Its movement may have made nearly or quite as much noise
as did that of the hand car. Until he heard the whistle of the
freight train he had no reason to suppose there was a loco-
motive within five miles of the crossing, nor does it appear
that any other was. He says: "I thought all I had to look
out for was the locomotive I heard." He did look out for
that. He knew that "considerable switching was done on the
side and main track at Saybrook," and "saw hand cars going
sometimes;" but on this occasion he "didn't think about the
hand car."

This is the whole case on the evidence, from which it is suf-
ficiently clear that appellee's injury was not the result of a
pure accident. Either he or the defendant's servants, or both,
should be held responsible for it, and to determine which was
the office of the jury. What did appellee do that reasonable
care for his own safety forbade, or what omit that it required
him to do?

It is idle to suggest that he was careless with reference to
the coming train. That was half a mile, and he but about
twenty feet from the crossing, when he started up to make it.
When it reached the crossing the hand car, wreck and victim
had been removed. There was ample time to cross ahead of
it without hurrying, and yet he was careful enough to hurry.

But it is said he should have taken the precaution to ascer-
tain, by looking and listening, that the track in the immediate
vicinity was clear; in other words, that no hand car was com-
ing and dangerously near; that the car in the street, obstruct-

ing his view of the main track from his wagon, made the situation unusually dangerous and required a proportionate degree of care on his part. That is a general rule of law and reason. It may have much force where the party asking the benefit of it is not in fault for the existence of the unusual danger. But here appellant's servants placed the car in the street and left it there wrongfully. If, as between these parties, its presence required unusual care in making the crossing, the jury may have thought the defendant's servants were under the greater obligation to stop the hand car to hear, and to get out to see whether a team was approaching on Grand street, or at least so reduce their speed before passing the freight car as to be able to stop without colliding. They had no more right to make the crossing than had the plaintiff, and were as much bound to use care for the safety of themselves as others having the same right, in making it.

This place was outside of the village settlement, though within its platted bounds. There were but these two railroad tracks. It was not shown that any other car was there besides the five referred to, until the hand car appeared. No switching was being done. No locomotive was there to do it. No train was coming, near enough to forbid plaintiff's attempt to cross, and none would come without due warning to him. He could not see the hand car from his wagon at any point of his way until he passed the end of the freight, and did not hear it. He did not think of it.

Was that a lack of ordinary care for his own safety? Would reasonably cautious men, under like circumstances, no other danger appearing or existing, look for, listen for, or think of a hand car? This is a matter of opinion and judgment, and although different minds might differ about it, we see no sufficient reason for overruling the conclusion of the jury. We also are inclined to think that unless there was some circumstance positively calling attention to it, the subject of hand cars as a source of danger would have occurred to the minds of a very few, at most, out of many persons in the position of the plaintiff. The statute and ordinances do not require any notice of their movement, nor prescribe any limit

to their rate of speed.   Properly managed they are not dan-
gerous, in fact, without such notice, nor generally so regarded.

It is said that he might and should have stopped, when he
did see it.   The evidence tends to show that to avoid it he
would have had to back also.   His horses had just been slapped
up, had the rein, and were hurrying.   If not already on the
track, their heads must have been over it before they could
be stopped.   Was it practicable to back out in time?   And if
so, was it advisable?   What would have been the effect on the
team of the rushing car so close to their heads, and how would
it have been left with reference to the freight train so soon to
pass?   Appellee had every motive to pursue the course that
appeared to him to be the safest.   The situation did not admit
of deliberation, and if that was not due to his fault, error in
judgment should not be attributed to carelessness.   He doubt-
less did the best he could to judge rightly.

The following special interrogatory was submitted to the
jury:  "Did plaintiff exercise ordinary care and prudence for
his own safety in attempting to pass over the crossing, and in
the manner shown by the evidence?"   Their answer was,
"Yes."   We think this was supported by the proof, and
must be held conclusive.

Their warrant for finding the defendant guilty of negligence
has already been indicated.   No excuse appears for its leav-
ing the freight car on the street as it did, and the effect of
that fault is shown by its own witnesses.   In view of that,
the jury could well find also that the manner of running the
hand car was wrongfully negligent.

The declaration is in four counts, of which the first charges,
generally, that the defendant's servants carelessly drove
the hand car;  the second specifies the leaving of the freight
cars where they were on the side track, as the act of negli-
gence which was the cause of the injury;  the third avers
that the defendant's servants were driving a hand car on said
railroad toward said crossing and gave no notice to plaintiff of
their approach, and so negligently drove said hand car that it
struck his wagon, throwing him out and thereby injuring
him; and the fourth, that defendant with force and arms

assaulted plaintiff and with a hand car struck his wagon, etc.

The formal *ad damnum*, which is in $5,000, appears at the end of the third count, and nowhere else in the declaration. It is said that therefore the plaintiff could recover under that count only; and in this case, not under that; because there was no evidence that the defendant was possessed of, or operating the railroad or the hand car, or that the men running it were the defendant's servants, as therein averred.

We know of no such rule of pleading as that here stated. Perhaps the fourth count was obnoxious to a special demurrer. That count was evidently added after the declaration had been completed, and is of no importance. The *ad damnum* applies to all the counts that precede it. Burst v. Wayne, 13 Ill. 599. It is neither necessary nor customary to put it in each.

The relation of the defendant to the railroad, as possessor and operator, and to the men in charge of the hand car, as master, was not a real issue in the case. That was assumed and conceded, and the case tried on that theory by both parties. Thus the first instruction asked by the defendant and given, was, "That the *fact* that one of *defendant's* freight cars *was* standing on the side track  *  *  *  *did* not relieve the plaintiff from exercising ordinary care," etc. The fifth was, " That the railroad company had a lawful right to have its stock pens and cattle chute on the line of its right of way between Grand street crossing and the river  *  *  *  and any number of cars standing on its switch or side track outside of the line of intersecting streets," etc. The first modified instruction for defendant was, " That the defendant had a right to have a hand car on the track of its railroad," etc., and the modification did not affect that statement. The omission of positive formal proof on this point was not suggested before the verdict was rendered. If it had been, the court would have allowed it to be supplied. This objection comes too late, and with too little merit in itself.

Dr. Winter was asked to " state whether, in a man of his age, those injuries are permanent or not," and " were the injuries he received of a class that were necessarily painful ?"

Counsel think the questions were leading. We do not. It was discretionary with the court to allow or refuse to allow defendant to impeach its own witness, Greene. The affidavit relating to him, and the paper he is said to have signed, are not in the abstract.

No material error is perceived in giving, modifying or refusing instructions. In the clause in the ninth, given for plaintiff—" but also *an* impairment of the plaintiff's general health, which is shown by the evidence," the context shows the word " an " was intended to be " any," and it was doubtless so understood. We do not approve it as corrected, but have no idea that it did any harm.

It is, of course, difficult to estimate the damages to plaintiff. He suffered from concussion of the brain, making him delirous most of the time for ten days. One bone of his wrist was broken and the other dislocated. The arm was kept in splints six weeks, and is seriously and permanently crippled. He was almost entirely deprived of the sight of one eye by tromatic cataract. His neck, shoulders and body were badly bruised and perhaps there was serious internal injury. He suffered great pain—continuing to the time of trial. He has not been able to do any work since the injuries were received. The damages allowed may seem to be large. We are not as able to judge of that as was the Circuit Court and jury. On the whole we see no sufficient reason for interfering with their judgment.          *Judgment affirmed.*